IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RONALD F. COONEN and
THOMAS MOQUINO, JR.,

        Plaintiffs,

      vs.                              No. **CIV-04-1035 MCA/ACT**

SANDIA CORPORATION,
a Delaware Corporation,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiffs' Motion for Summary Judgment* [Doc. 27], filed May 23, 2005, and *Defendant Sandia's Motion for Summary Judgment* [Doc. 29], also filed May 23, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court denies *Plaintiffs' Motion for Summary Judgment* and grants *Defendant Sandia's Motion for Summary Judgment*.

On September 14, 2004, Ronald Coonen commenced an action to enforce rights and clarify rights to future benefits under the Sandia Corporation Retirement Income Plan ("the Plan").[1] The *Complaint* was filed pursuant to the Employment Retirement Income Security

---

[1] Thomas Moquino, Jr. also was originally a plaintiff in this action, seeking to enforce rights and clarify rights to future benefits under the Sandia Corporation Pension Security Plan. Unlike Coonen, however, Moquino did not exhaust his administrative remedies. For that reason, the Court dismissed Moquino's claims in a *Memorandum Opinion and Order* filed August 31, 2005. [See Doc. 38].

Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) and (e).  [Doc. 1 at 1].  It is undisputed that Coonen has fully exhausted his administrative remedies.  [Id. at 4; Doc. 7 at 3].

## I. BACKGROUND

Ronald Coonen began his employment with Defendant Sandia Corporation ("Sandia") in 1975 as a Recurrent Security Inspector ("RSI").  He worked in that capacity until 1976, when he became a regular Security Inspector.  [Doc. 1 at 2].   In his year as an RSI, Coonen represents that he worked approximately 1,968 hours, which he alleges is equivalent to the number of hours worked by Sandia's regular Security Inspectors.  [Id.].  While employed as an RSI, Coonen maintains that he worked a regular, published weekly schedule and was held to the same requirements and training as Sandia's regular Security Inspectors.  While employed as an RSI, Coonen worked five days a week for three weeks and then four days a week for one week.  [Doc. 33 at 10].

Hoping to retire at age 62, Coonen applied to have his hours as an RSI credited toward his net credited pension for the purpose of calculating his future pension benefits.  His application, however, was denied initially by the Employee Benefits Committee ("EBC") and subsequently by the Employee Benefits Claim Review Committee ("EBCRC") after an appeal.  [Doc. 28 at 5].

Following Coonen's filing of  his *Complaint*, both he and Sandia filed motions for summary judgment.  [See Docs. 27, 29].  Coonen argues that he is entitled to receive pension credit for time worked as an RSI, and that Sandia's interpretation of the Plan is

unsupportable under any standard of review.  [Doc. 28 at 9].

## II. ANALYSIS

### A. Standard of Review

Section 1132 of ERISA provides, in pertinent part, that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ."  29 U.S.C. § 1132(a)(1)(B).  In this case, the first question before the Court is the applicable standard of review.

The denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed *de novo* unless the applicable plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  In this case, the administrator enjoys that discretion, as evidenced in the administrative record at section 3 of the Plan.[2]  Thus, where the plan

---

[2]  The applicable passage of the Plan provides as follows:

> The Employee Benefits Committee, in those cases in which there is no request for review, or the Employee Benefits Claim Review Committee, when it reviews a denial of a claim, shall control and manage the operation and administration of the Plan, including but not limited to, the determination of all questions relating to eligibility for participation and benefits, interpretation of all plan provisions, determination of the amount and kind of benefits payable to any participant, spouse or beneficiary, and construction of disputed or doubtful terms, and determine conclusively for all parties all questions arising in the administration of the Plan and any decision of such Committee or Review Committee shall not be subject to further review.

gives the administrator such discretion, the Court applies an arbitrary and capricious standard of review, Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir. 1998), and "'review is limited to determining whether [the plan administrator's] interpretation was reasonable and made in good faith.'" Fought v. Unum Life Ins. Co. Of Am., 379 F.3d 997, 1003 (10th Cir. 2004) (quoting Hickman v. GEM Ins. Co., 299 F.3d 1208, 1213 (10th Cir.2002)).  Additionally,

> assuming full and expansive discretion has been conferred, then the plan administrator's interpretation of ambiguous plan provision should be judged as follows: (a) as a result of reasoned and principled process (b) consistent with any prior interpretations by the plan administrator (c) reasonable in light of any external standards and (d) consistent with the purposes of the plan.

Fought, 379 F.3d at 1003 (quoting Kathryn J. Kennedy, Judicial Standard of Review in ERISA Benefit Claim Cases, 50 Am. U.L.Rev. 1083, 1135, 1172 (2001) (hereinafter, Kennedy, Judicial Standard)).

While the arbitrary and capricious standard of review is applicable in this case, if a plan administrator with discretionary authority operates under a conflict of interest, that conflict must be weighed as a factor in the determination of whether the administrator has committed an abuse of discretion.[3]  Fought, 379 F.3d at 1003.  This is because "'[a] conflicted fiduciary may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries.'"  Id. (quoting Brown v. Blue Cross & Blue Shield, Inc., 898 F.2d

---

[AR at 111, ¶ 4].

[3]  In this context, the Tenth Circuit treats the terms "arbitrary and capricious" and "abuse of discretion" as interchangeable.  Fought, 379 F.3d at 1003 n.2.

1556, 1565 (11th Cir.1990)).

A conflict is not assumed simply because an administrator operates both as a trustee or fiduciary and as settlor of the plan. Rather, "ERISA envisions that a fiduciary may wear two hats, one of a trustee or fiduciary and one of a settlor." Fought, 379 F.3d at 1005 (internal quotations omitted). Accordingly, a demonstrated conflict requires proof that the plan administrator's dual role jeopardized his impartiality. Id. Because the mere fact that the plan administrator is also a company employee is not enough *per se* to demonstrate a conflict, the Court considers such factors as whether (1) the plan is self-funded, (2) the company funding the plan appointed and compensated the plan administrator, (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits, and (4) the provision of benefits would have a significant economic impact on the company administering the plan. Id. "If the plaintiff cannot establish a *serious* conflict of interest, we consider defendant's standard[4] conflict of interest as one factor in determining whether defendant's denial of . . . benefits to plaintiff was arbitrary and capricious." Id.

---

[4] A second type of conflict of interest—an inherent conflict of interest—exists where the payor, for example an insurer, pays benefits from its own assets rather than a trust, putting the payor in perpetual conflict with its profit-making role as a business. Kennedy, Judicial Standard at 1150 (internal quotation omitted). In the event of an inherent conflict of interest, an additional reduction in deference is appropriate and the plan administrator bears the burden of proving the reasonableness of its decision pursuant to the traditional arbitrary and capricious standard. Fought, 379 F.3d at 1006. "In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." Id. It then becomes the job of the Court to "take a hard look" at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest. Id.

(emphasis added).  Where a conflict of interest exists, the Court applies an arbitrary and capricious standard but "undertake[s] a 'sliding scale' analysis, according deference in inverse proportion to the degree of seriousness of the conflict."  Wolberg v. AT & T Broadband Pension Plan, 123 Fed. Appx. 840, 845 (10th Cir. 2005).

In this case, it is undisputed that Sandia is both the administrator and the funding entity of the Plan.  [Doc. 28, Exh. 1, *Defendant Sandia Corporation's Answers to Plaintiffs' First Set of Interrogatories* at 1-3].  As such, Sandia operates under a standard conflict of interest and Coonen bears the burden of proving that this dual role jeopardized the plan administrators' impartiality.   See Fought, 379 F.3d at 1005; see also  Wolberg, 123 Fed. Appx. at 845.[5]  This Court concludes that Coonen has failed to establish elements (3) and (4) of the Fought conflict-of-interest analysis.  See Fought, 379 F.3d at 1005.

Coonen urges the Court to find that he has shown that plan administrators' performance reviews or level of compensation were linked to the denial of benefits.  As evidence of this connection, Coonen cites performance reviews (reflected in the

---

[5] Explaining that

> [t]his case presents a situation where there may be what could be termed a standard conflict of interest because the plan administrator and members of the Committee are employees and, presumably, participant/beneficiaries of their employer's self-funded plan. In such situations the burden of proof is on the plaintiff to prove the existence of the conflict, see Fought v. Unum Life Ins. Co. of America, 379 F.3d 997, 1005 (10th Cir.2004), and to prove that any such conflict jeopardized the administrator's impartiality.  Wolberg, 123 Fed. Appx. at 845.

administrative record) showing that administrators had done, among other things, the following: (1) framed strategic issues of stagnating revenue, medical cost growth, and pension fund contributions; (2) provided credible stewardship of the Plan; (3) assisted in securing necessary approval of the Plan that greatly benefitted present and future retirees; (4) supported the development of significant improvements to the Plan for non-represented employees; (5) accomplished a "road map" for Plan changes that was approved by Sandia's Board of Directors in January 2001; and (6) accomplished a domestic equity value manager evaluation, which resulted in the hiring of three new value managers and the termination of another. [Doc. 28; Exh. 5]. In reviewing these, the Court is not persuaded that they demonstrate that the plan administrators' performance reviews or level of compensation were linked to the denial of benefits. Coonen has failed to demonstrate or articulate *how* such performance reviews were linked to or impacted the denial of benefits. Accordingly, the Court concludes that Coonen's evidence falls short of that needed to establish the third <u>Fought</u> factor.

The Court similarly concludes that Coonen has failed to establish that the provision of benefits would have a significant economic impact on Sandia. <u>See</u> <u>Fought</u>, 379 F.3d at 1005. First, the Plan assets are held in a trust from which Sandia may not benefit. <u>See</u> 29 U.S.C. § 1103(c)(1).[6] Additionally, Sandia has represented in answers to interrogatories that

_____

[6] That subsection states that

[e]xcept as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title

the value of the Plan assets as of December 31, 2004 was $3,024,832,456, and that if Coonen were to receive the credit he has requested, he would receive less than an additional $1,100 annually, which is less than one three-millionth of the value of the Plan. [Doc. 28, Exh. 1 at 8-9]. Sandia also submits that if Coonen and every former RSI similarly situated to him were to receive the credit Coonen has requested, Sandia's potential additional actuarial cost would be only $188,000, which represents less than nine thousandths of a percent of Sandia's $2.2 billion annual budget. [Doc. 32 at 8-9; see also Kimber v. Thiokol Corp., 196 F.3d 1092, 1099 (10th Cir. 1999) (concluding that Plan had no significant economic impact on company where long-term disability costs amounted to no more than .3% of company's operating expenses during relevant time period)].

Because the Court determines that Coonen has not established elements (3) and (4) of the Fought conflict-of-interest analysis, Sandia's standard conflict of interest must be considered as only one factor in the Court's review. Consequently, the Court will apply an arbitrary and capricious standard to the decisions of the EBC and the EBCRC, "adjusted but still according significant deference to the Committee[s], and requiring no shift in the burden of proof as to the reasonableness of the Committee[s'] decision[s]." Wolberg, 123 Fed.

---

(relating to termination of insured plans), or under section 420 of Title 26 (as in effect on October 22, 2004), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

29 U.S.C. § 1103 (c)(1).

Appx. at 846-847.  In so doing, the Court considers only the arguments and evidence before the EBC and the EBCRC  at the time they made their decisions.  <u>See</u> <u>Sandoval v. Aetna Life and Cas. Ins. Co.</u>, 967 F.2d 377, 381 (10th Cir. 1992) ("In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision.").

### B. The Terms of the Plan

A determination as to whether Sandia, as administrator of the Plan, acted arbitrarily and capriciously in denying Coonen the benefits he sought necessarily begins with an examination of the relevant terms of the Plan.  The evidence present in the administrative record indicates that under the terms of the Plan, the pension benefits received by a Sandia employee are determined, in part, by what the Plan calls "Credited Service-B."  [AR at 119]. The Summary Plan Description ("SPD")  states that "[n]et credited pension service is used to calculate your pension benefit."  [<u>Id.</u> at 174].  Both "Credited Service-B" and "net credited pension service" are defined, in part, by an employee's "term of employment."  [<u>Id.</u> at 107, 174, 207].  Under the Plan, "term of employment" is defined as "a period of continuous employment as established by the Company's practices, consistent with the non-discrimination and equal employment requirements of ERISA, the [Internal Revenue] Code, ADEA, Title VII of the Federal Civil Rights Act of 1964, Executive Order 11246, and other federal and state equal opportunity laws applicable to the Company."  [<u>Id.</u> at 106].  The SPD

defines "term of employment" as "[a]ll your current years of continuous employment as a *regular employee* with Sandia, plus any eligible service transferred from a parent organization and recognized by Sandia.  As allowed by company policy, term of employment may also include periods of previous service, non-regular service, and certain absences." [Id. at 208 (emphasis added)].

While the Plan defines "employee" as, in part, "an individual who receives a regular and stated compensation, other than a pension or retainer from the Company, and who in such capacity is not an employee in a bargaining unit represented by a union[,]" [AR at 104], the Plan does not include a definition of "regular employee."  [See id. at 104-108, "Section 2. Definitions"].  The SPD, however, states that a "regular employee" is [a]ny full-time or part-time Sandia employee scheduled to continue working 20 or more hours a week for an indefinite period of time."  [Id. at 208].

### C. The Proceeding Before the EBC

Turning to the proceeding before the EBC, the record discloses that, in a May 13, 2002 memo with the subject line "Request for a review of my service date," Coonen explained that in the year he spent as an RSI, he worked 1,968 hours, the same amount of time worked by a full-time employee, and for which he believed he was entitled to pension credit.  [AR at 22-23, 25].  Coonen requested to have his hours as an RSI credited toward his term of employment for the purpose of calculating his future pension benefits.  In support of his request, Coonen provided to the EBC a memo dated June 30, 1983, in which

10

the author, J.D. Martin, stated that ERISA regulations "require that if 1000 hours of work are performed, then the individual must be covered by the corporate retirement plan."  [Id. at 36].  The memo then asked if the 1,000-hour limitation applied to extra-board (recurrent) security inspectors, explaining that, "[w]ith very rare exception all extra-board security inspectors work in excess of 1000 hours per year . . . ."  [Id. at 37 (emphasis in original)].  Martin ultimately recommended determining the start date of extra-board security inspectors and adjusting their service date back to that date for retirement purposes and ensuring that when the 1,000-hour limitation was reached, action be taken to credit the employee for that year for retirement purposes or to assign no more work for that year.  [Id. at 9].  The EBC considered the substance of  this memo but noted that, while it "had space for approval by several people . . . the only signature on the memo was that of J.D. Martin."  [Id. at 14].  The reasonable inference to be drawn from the absence of signatures is that this memo was merely a draft, was not authorized, and the substance of its recommendations was not indicative of Sandia practice or policy.

The EBC additionally considered a "Memo of Record" dated July 7, 1983 and with the subject line "Extra-Board, Hours of Work."  This memo, also authored by J.D. Martin, was approved by D.S. Tarbox, J.R. Garcia, and Q.B. San Hamel.  [AR at 33].  This memo is silent as to pension credit.  The EBC noted that the memo addressed credit for vesting purposes only and in no way changed the rule for pension service credit.  [Id. at 14; see also AR at 33, "Extra-board security inspectors are covered by the ERISA regulation which

stipulates that an individual who works 1000 hours or more will receive appropriate retirement credits *for vesting purposes*." (emphasis added)]. That the 1,000-hour limitation applies to vesting is consistent with Plan language providing that "[t]he expression "Year of Service," for determining Plan participation and eligibility for a deferred vested pension, shall mean a computation period in which an employee completes one thousand (1000) Hours of Service." [Id. at 106; see also AR at 13, "You will receive one year of vested service for each calendar year in which you are credited with at least 1,000 hours of service . . . ."].

The EBC further considered Sandia's "term of employment" policy in effect at the relevant time. [See AR at 14; see also AR at 81]. The proper interpretation of "term of employment" has been a fiercely debated topic between the parties. Coonen reasons that, because in the one year he worked as an RSI he put in 1,968 hours, as many as would have been worked by a regular Security Inspector, the time he spent as an RSI should count in the calculation of his pension benefits. Sandia counters that the Plan language distinguishes between "term of employment," which is defined by reference to Sandia's practices and determines accrual benefits, and "year of service," which determines vesting and is equal to 1,000 hours of service. Thus, submits Sandia, "[b]y arguing that [he] worked hours comparable to regular employees, [Coonen] here ignore[s] the clear distinction between the phrases "term of employment" and "[y]ear of [s]ervice" as used in the Plans." [Doc. 30 at 17].

12

The "term of employment" policy considered by the EBC is included in SCI 4005 and bears a date of October 12, 1964. [AR at 81]. SCI 4005 "prescribes the procedures for crediting and changing Term of Employment." [Id.]. The Instruction goes on to list the circumstances under which a regular employee may be given term-of-employment credit. [Id.]. Section 1.24 provides that credit is given to a regular employee for "[p]revious Sandia Corporation temporary employment in staff classification (Staff Aide or Staff Member) immediately upon reemployment as a Staff Member . . . ." [Id. at 82]. The EBC relied on this section in considering Coonen's request, but concluded that Coonen's case did not come within it because "Recurrent Security Inspectors were not considered to be a staff classification and [Coonen was] not hired as a Staff Member." [Id. at 14]. It was reasonable for the EBC to reach this conclusion, as indicated in the record is a May 8, 2002 memo to Coonen from Marlene Vigil, in which Vigil, quoting from SCI 4005, explained that Coonen was not entitled to the credit he was seeking because his position as an RSI was not a staff position and he was not hired as a regular employee into a staff position. [Id. at 24].

Further support for the EBC's determination that time spent as a member of the recurrent workforce was not intended to count toward a term of employment for which the recurrent employee would receive pension credit benefits can be found in documents included in the administrative record explaining the purposes behind the creation of a recurrent workforce. A memo dated December 17, 1973 began by recognizing the impossibility of "delay[ing] today's work until tomorrow simply because a guard calls in

sick." [AR at 68]. Accordingly, three proposals were offered: (1) the formation of a "standing army" of guards, (2) the use of overtime, and (3) the creation of a group of extra-boarders. [Id. at 68-69]. Pointing out the advantages of the extra-board concept, as well as the fact that such a staffing procedure had been used by railroads and the postal service for years, the memo contemplated a group of people trained to perform the necessary work and called to duty when sickness, vacation, or other reasons forced absences. Extra-boarders were to be on the job and paid only if a need for their services arose, and they were expected to perform the regular work of the Sandia security force. [Id. at 68].

The December 17, 1973, memo also explained that "[t]he extra-board concept is currently provided for and, in fact, detailed . . . in SLA company policy." [AR at 72]. Indeed, SLI 4000, dated November 21, 1973, provided that

> [a] nonregular recurrent employee is an individual who is hired to work on a day-to-day basis, as needed, to supplement the regular staff during their temporary absences or recurring brief work-load peaks. This classification should not be used if an individual is engaged daily for more than four consecutive weeks or on a regular schedule but not daily for more than six consecutive months. Examples are: Nurses, Medical Technologist and X-ray Technician.

[Id. at 64]. SLI 4000 also differentiated among the several classes of Sandia employees, defining not just nonregular recurrent employees but nonregular temporary employees and regular employees as well. [Id.]. A reasonable inference to be drawn from these documents is that RSIs were never intended to be considered regular employees entitled to pension credit beneifts.

14

After having considered the matter with Coonen at its June 24, 2002, meeting, and after having reviewed the various memos provided to it, as well as the "term of employment" policy in effect at the relevant time, the EBC determined that Coonen was not entitled to pension credit for the time he spent as an RSI.  Consequently, the EBC denied Coonen's claim, explaining that "the EBC voted unanimously to deny your request for time as a recurrent security inspector."  [AR at 15].  The EBC then advised Coonen of his right to appeal the denial to the EBCRC within 60 days of receipt of the denial letter.  [Id.].

### D. The Proceeding Before the EBCRC

The terms of the Plan provide, in pertinent part, that "[a]ny participant whose claim for benefits has been denied, in whole or part, may, within sixty (60) days after receipt of notice of denial, submit a written request for review of the decision denying the claim [to the EBCRC]."  [AR at 110].  Within 60 days of receipt of the EBC's letter denying his claim, Coonen, through his attorney, submitted a written request for review of the EBC's determination.  [See AR at 2-5].  By memorandum dated December 12, 2002, a representative of Sandia invited Coonen to a January 8, 2003 meeting of the EBCRC, explaining that Coonen would at that time be given the opportunity to speak directly to Committee members and present the issues concerning his case.  [AR at 6].

Both Coonen and his attorney appeared at and participated in the EBCRC's January 8, 2003 meeting.  [See AR at 97].  Notwithstanding their participation, the EBCRC affirmed the decision of the EBC.  In its letter to Coonen explaining the affirmance, the EBCRC

stated that, in addition to reviewing the information Coonen had provided to the EBC, as well as the provisions of the Plan, the EBCRC also sought additional analysis of the issue from ERISA and benefits plans attorney Julie Neerken, of Rodey, Dickason, Sloan, Akin & Robb, P.C.  [AR at 97].  Neerken's written opinion, which is included in the administrative record, reveals that in making her analysis she reviewed (1) the Plan, as amended and restated effective June; (2) the December 17, 1973 memo; (3) the "Memo of Record" dated July 7, 1983; (4) SLI 4005; (5) SCI 4005, dated October 12, 1964; (6) a Corporate Process Requirement ("CPR") dated May 9, 2000; and (7) the J.D. Martin memo of June 30, 1983. [Id. at 56-59].  A summary of Neerken's opinion follows.

Based on the information contained in the December 17, 1973 memo, Neerken opined that RSIs "were not considered employed on a regular schedule, due to the 'on demand' nature of their engagement."  [AR at 57].  Neerken next opined  that the July 7, 1983 memo, which addressed the 1,000-hour work limitation for purposes of vesting, did not address credited service.  [Id. at 58].  As for SLI 4005, which discussed guidelines for establishing and changing an employee's credited service, Neerken noted that

> [i]t specifically addresses credit for non-regular service, providing that prior service as a non-regular staff employee is included in total credited service without respect to the length of prior service if the employee is hired into a regular staff position within 30 days of terminating non-regular staff status or completing schooling which immediately followed Sandia employee in a non-regular staff position.

[Id.].  Neerken emphasized that these are the only conditions for which credited service may

be granted for periods of non-regular service.  [Id.].

Turning to SCI 4005, dated October 12, 1964, which was in effect on Coonen's date of hire, Neerken opined that its provisions specified that "term of employment" included previous Sandia temporary employment in the "staff" classification only.  [AR at 59]. Neerken likewise concluded that the May 9, 2000 CPR did not support Coonen's position inasmuch as it defined "term of employment" as "the current period of continuous employment as a regular employee plus previous periods of eligible employment from related companies, and may include periods of non-regular service."   Finally, Neerken opined  that the June 30, 1983 memo of J.D. Martin misconstrued ERISA regulations and made recommendations based on those misconceptions.  [Id.].

Having considered these documents, Tenth Circuit case authority, and ERISA and Internal Revenue Code sections, Neerken concluded that the Plan calculates pension benefits (as opposed to vesting) by reference to the phrase "term of employment."  [AR at 60]. "Term of employment," in turn, is defined by Sandia practice and policies to exclude non-regular recurrent service.  When Coonen was hired as an RSI in 1975, Sandia practice was to treat him as a non-regular employee.  When Coonen became a regular employee the next year, Sandia policy was not to award him retroactive credit because he was not hired into a staff position.  Expressing her understanding that the Plan had "uniformly treated all participants initially engaged as recurrent security inspectors as not entitled to retroactive credited service under company policies[,]" Neerken concluded that Coonen did not qualify

17

for credited service for the year he spent as an RSI.  [Id.].  The EBCRC adopted Neerken's reasoning.

This Court has reviewed the decision of the EBC and the documentation on which the EBC relied in determining that Coonen's time as an RSI does not count toward the calculation of his service pension, as well as the decision of the EBCRC, and the documentation upon which it relied.   The Court concludes that the Committees' determinations are reasonable and supported by substantial evidence in the record.  See Fought, 379 F.3d at 1006.  The evidence in the administrative record shows that, pursuant to Sandia practice and policy reaching back as early as 1964, time spent as a member of the recurrent workforce did not count toward pension credit for former recurrent employees who have since been made regular Sandia employees [AR 45-47; 64; 75][7].  That RSIs performed the same work as that performed by regular Security Inspectors does not indicate that RSIs were actually treated as regular employees as much as it tends to show that RSIs performed as contemplated when the recurrent workforce was created; that is, as a group of guards

---

[7] The administrative record includes a "Notification of Bridged Service" for Patrick D. O'Neill, which shows that he was hired as an RSI on November 17, 1976, terminated June 21, 1979, and rehired June 22, 1979 [AR at 20].  Coonen points to the O'Neill document in support of his argument that the EBCRC did not carefully review the record because, if it had, it would have seen that "Patrick O'Neill was one former Recurrent Security Inspector who Sandia allowed to count his time spent in that position toward his pension benefit by recalculating his 'service date' to be the time that he was initially employed as a Recurrent Security Inspector."  [Doc. 33 at 3, n.1].  The O'Neill document, however, leaves unclear whether O'Neill's pension benefit calculation was affected by his adjusted service date, inasmuch as the document informed O'Neill that "this adjustment *may* affect your employee benefits.  *If so*, you will soon receive a statement from the Employee Benefits Division concerning changes in your benefits and any actions necessary."  [AR at 20 (emphasis added)].

trained and ready to do the regular work of absent Sandia Security Inspectors.  [See AR at 64, 69].  Coonen's  emphasis on number of hours worked is misplaced, since hours worked are not, by Sandia practice, used to calculate pension benefits.  Rather, term of employment determines pension benefits, and substantial evidence supports the conclusion that time spent as an RSI, which is not considered time spent as a regular employee, determines term of employment.  Finally, the fact that it was Sandia policy, as reflected in the administrative record at SCI 4005, to consider a temporary employee continuously employed for six or more months as having become a regular employee does not assist Coonen, who as an RSI was not a temporary employee but, instead, a non-regular recurrent employee.  This Court finds that there is substantial evidence in the record that the decisions reached by EBC and ERCRC were (1) the result of a reasoned review process, (2) consistent with prior interpretations, and (3) consistent in furthering the purposes of the Plan.   The plan administrators provided a reasonable interpretation of the Plan's terms and provisions to the facts and circumstances of Coonen's case.  The Court concludes that the determinations of the EBC and the EBCRC were not arbitrary or capricious or otherwise contrary to law.

## III. CONCLUSION

The Court concludes that the determinations of both the EBC and the EBCRC are reasonable and supported by substantial evidence, and not arbitrary or capricious. Accordingly, the Court denies *Plaintiffs' Motion for Summary Judgment* and grants *Defendant Sandia's Motion for Summary Judgment*.

19

**IT IS, THEREFORE, ORDERED** that *Plaintiffs' Motion for Summary Judgment* [Doc. 27] is **DENIED**;

**IT IS FURTHER ORDERED** that *Defendant Sandia's Motion for Summary Judgment* [Doc.29] is **GRANTED**.

**SO ORDERED** this 31st day of March, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

20